UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF OHIO

WESTERN DIVISION

- - -

FILED

MAR 8 2002

Kenneth J. Murphy, Clerk
CINCINNATI, OHIO

| | | |
|---|---|---|
| CARL OEDER & SONS SAND & GRAVEL CO., | : | CIVIL ACTION C-1-01-826 |
| | : | Cincinnati, Ohio |
| Plaintiff, | : | Thurs., December 20, 2001 |
| | : | |
| -vs- | : | |
| | : | |
| UNION TOWNSHIP, et. al., | : | Hearing on Preliminary |
| | : | Injunction |
| | : | |
| Defendant. | : | 2:40 p.m. |

4879

- - -

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE SUSAN J. DLOTT, JUDGE

- - -

For the Plaintiff:     Brian P. Barger, Esq.
                       Jack J. Brady, Esq.
                       BRADY, COYLE & SCHMIDT, LLP
                       4052 Holland Sylvania Road
                       Toledo, Ohio  43623

                       Daniel Donnellon, Esq.
                       Thomas M. Tepe, Jr., Esq.
                       KEATING, MUETHING & KLEKAMP, PLL
                       1400 Provident Tower
                       Cincinnati, Ohio  45202

For the Defendant:     Patrick K. Dunphy, Esq.
                       FALKE & DUNPHY, LLC
                       30 Wyoming Street
                       Dayton, Ohio  45409-2731


Law Clerk:  Ben Glassman
Courtroom Deputy:  Steve Snyder
Court Reporter:  Betty Schwab

I N D E X

| PLAINTIFF WITNESS: | DIRECT | CROSS | RD | RC | FD | FC |
|---|---|---|---|---|---|---|
| DAVID OEDER | | | | | | |
| (by Mr. Brady) | 11 | | 21 | | | |
| (by Mr. Dunphy) | | 14 | | | | |

DEFENSE WITNESSES:

| LIONEL LAWHORN | | | | | | |
|---|---|---|---|---|---|---|
| (by Mr. Dunphy) | 23 | | | | | |
| (by Mr. Barger) | | 38 | | | | |
| HARRY HERBST | | | | | | |
| (by Mr. Dunphy) | 41 | | | | | |

1　　　　　　　　　　　　PROCEEDINGS

2　　　　　THE COURT:  Good afternoon to everyone.  I

3　apologize for starting late, but our morning hearing ran

4　way over.

5　　　　　Let me ask counsel to enter their appearances for

6　the record.

7　　　　　MR. DONNELLON:  Good afternoon, Your Honor.  Dan

8　Donnellon, Keating, Muething & Klekamp, and I'm here as

9　trial counsel of record along with Mr. Tepe from Keating

10　Muething & Klekamp.

11　　　　　With me are two attorneys from Toledo with pro

12　hoc vice motions pending.

13　　　　　MR. BARGER:  Brian Barger and my partner Jack

14　Brady.

15　　　　　THE COURT:  And who else have you got with you

16　there, Mr. Donnellon?  Is that Mr. Oeder?

17　　　　　MR. DONNELLON:  Mr. Oeder and Mr. Oeder.

18　　　　　THE COURT:  Oh, Mr. Oeder and Mr. Oeder.  Okay.

19　Which one is David, the plaintiff?  That's you.

20　　　　　MR. DONNELLON:  And Carl Oeder as well.

21　　　　　THE COURT:  What relation are the two of you?

22　　　　　MR. DAVID OEDER:  Father and son.

23　　　　　THE COURT:  Okay.  I thought maybe you were

24　brothers.  All right.

25　　　　　And for the defense?

1    MR. DUNPHY:  Yes, Your Honor, Pat Dunphy on

2  behalf of Union Township.

3    THE COURT:  And you have got with you

4  Mr. Lawhorn?

5    MR. DUNPHY:  Yes, Your Honor.  He's Union

6  Township trustee.

7    THE COURT:  Where is Union Township?

8    MR. DUNPHY:  It's in Warren County just south of

9  Lebanon, Your Honor.

10    THE COURT:  South of Lebanon, so it's between

11  Lebanon -- and where is that, like what mile markers?

12    MR. LAWHORN:  It would be Exit 28 on Interstate

13  71.  State Route 48 would be around the highway patrol

14  post.  In that area would be Union Township.

15    THE COURT:  Got you.  Thanks.

16    All right.  Mr. Donnellon, do you want to

17  proceed?

18    MR. DONNELLON:  Yes, ma'am, Your Honor.  I would

19  hope that, with the case that preceded us, they provided at

20  least dessert for lunch.

21    THE COURT:  You can have an edible picture of the

22  last lawyer's kid or my dog, take your choice.

23    MR. DONNELLON:  We're here this morning on the

24  motion for a preliminary injunction that had been filed and

25  was pending before Judge Fedders prior to the removal.

1  Just a couple of housekeeping matters this morning.  The

2  first is we were served just moments ago with a memorandum

3  opposing.

4          THE COURT:  So was the Court.  And, needless to

5  say, I haven't read it.

6          MR. DONNELLON:  That's what I was going to point

7  out, that it's dilatory under the rule.  We had a little

8  extra time this afternoon to take a look, but we ask that

9  be disregarded.

10          Second, we also have the pro hoc vice motions

11  pending.  I understand from Mr. Dunphy that those are not

12  opposed.  And, if those are granted, I will turn the matter

13  over to Mr. Barger and Mr. Brady.

14          THE COURT:  Fine.  Granted.  Admitted.  It's a

15  pleasure to have you and your filing fees.

16          MR. BARGER:  Thank you.

17          MR. DONNELLON:  Mr. Barger will take over, Your

18  Honor.

19          THE COURT:  All right, Mr. Barger.

20          Gee, Mr. Donnellon, I was looking forward to

21  hearing from you.  Nothing personal, Mr. Barger.

22          MR. BARGER:  As the Court's aware, we're here

23  this afternoon, Your Honor, on the plaintiff's application

24  for a preliminary injunction in this matter.  We believe

25  that we have thoroughly briefed the matter, and, if the

1   Court has had an opportunity to review our brief, it

2   addresses most of the issues with respect to state law.

3          As Mr. Donnellon stated, we were served with a

4   copy of Defendants' opposing brief about an hour ago and

5   have not had a chance to look at that.  So, to the extent

6   that the Court would take that into consideration, we have

7   not had a chance to review what they have said in their

8   brief.

9          Nevertheless, the case is essentially about Union

10  Township, which is located in Warren County.  Our client

11  Oeder & Sons Sand & Gravel operates a sand and gravel

12  operation in both Union Township and the Village of South

13  Lebanon in Warren County.  They have two separate

14  operations, one known as the Miami View plant, which is

15  located in Union Township, and, in the Miami View plant,

16  they extract gravel from that operation and, by zoning

17  resolution, are not allowed to process at that location.

18  They then transport the material via trucks to their

19  processing plant, which is located partially in South

20  Lebanon and partially in Union Township.  And, depending on

21  which roads are available to be used, that trip can be as

22  little as 2.9 miles or as long as 7 miles.  And, in the

23  business of transporting gravel back and forth to be

24  processed, every mile counts in their ability to keep their

25  production operating.

1    In November of 2000, Union Township passed a

2    resolution which prohibited trucks weighing in excess of

3    20,000 pounds from using three roads in and around the

4    processing plant.  And, according to the zoning or

5    according to that resolution, it says it's based on Ohio

6    Revised Code 4511.07(I).

7    And addressing the merits of our claim here for

8    preliminary injunction, the Ohio Supreme Court has

9    addressed this very situation in a very similar case which

10   is the Geauga County Commissioners v. Munn Road Sand &

11   Gravel case, which is addressed in our brief.  In that

12   matter, the Court declared that the county does not have

13   the authority to enact a similar piece of legislation.  The

14   Munn Road Sand & Gravel case was also a matter where they

15   were prohibiting trucks in excess of 20,000 pounds from

16   using certain county roads in and around a sand and gravel

17   operation.  And the Ohio Supreme Court concluded that the

18   language used in 4511.07(I) is not an express grant of

19   authority to non-home rule political subdivisions.

20   Therefore, the county, lacking any authority to enact such

21   a resolution or ordinance was -- the Court declared that

22   the resolution in the Geauga County case to be invalid.

23   That similar legal analysis applies in our case

24   here today.  The townships do not enjoy home rule

25   authority.  They're strictly a creature of statute and

enjoy the authority given to them by the Ohio Revised Code, no more, no less. And there is very parallel, very similar analysis in that the -- in that 4511.07(I) does not contain an express grant of authority as declared by the Ohio Supreme Court, then either a county or a township can use that legislation as a basis for passing a resolution.

And that, Your Honor, is the essence of our case from a legal perspective.

Additionally, the ordinance as it currently or -- excuse me. The resolution, as it currently exists, prohibits the Oeders from using three roads, Lebanon Road, Dry Run Road and Snook Road, in and around their Miami View operation. That prohibition has caused them to suffer excessive damages, in that they have to find alternative means of transportation around those sites or alternative routes of transportation around those sites and has substantially slowed down their ability to process aggregate to supply customers. And, in fact, that's resulted in the loss of one large major customer of Oeders.

In addition, given the unique nature of the construction business or supplying materials to the construction business, most of those jobs are bid. It's very difficult to ascertain exactly where you are in the bidding scheme until you know what your truck pricing is, and it's hard to determine on an ongoing basis how many

more customers you're going to lose.

So, from the standpoint of having the Oeder & Sons suffer irreparable harm, we believe that that element has been met, and we would call the Court's attention to the <u>Columbia Gas Transmission</u> case, which we have cited in our brief, where the Sixth Circuit embraces a balancing of both the merits and irreparable harm in a preliminary injunction matter such that, if the case has a very, very strong success on the merits element, and that will -- that can be used to essentially weigh against or mitigate any of the other elements required for a preliminary injunction.

In addition, it is our allegation that there is no substantial harm to Defendants.  The plaintiffs have used those roads in the past and would like to continue using them.  There is no --

THE COURT:  How long have they been there?

MR. BARGER:  At Miami View Estates, two or three years.  And the ordinance was adopted a year ago, or the resolution was adopted a year ago.  They would like to keep using those roads, obviously.  There has been no showing of substantial harm, and, in fact, we are asking that the Court allow them to use the roads as they had and others have had in the past.  Not only the Oeders use the roads, but there are a number of people in the township that use those roads as well which are currently prohibited from

1  doing so.

2  Furthermore, we believe that it's in the public

3  interest to grant this preliminary injunction, in that it

4  would be contrary to the public interest to allow the

5  township to continue enforcing a resolution for which they

6  have no authority, and we believe that the public policy in

7  Ohio is well served by enjoining local governments from

8  exercising political power or legislative power not granted

9  to them by the legislature. And, furthermore, given that

10 the resolution seeks to prohibit a fundamental right to

11 travel, it is all the more important that the public's

12 interest in the free use of the roads be protected.

13 Accordingly, we would ask the Court to enjoin the

14 township from enforcing its resolution pending a

15 determination of this case on its merits.

16 We have David Oeder here today, who could testify

17 if it would enlighten the Court or help the Court in any of

18 its deliberations with respect to this matter, but we

19 believe that the matter can be resolved strictly on a --

20 simply on the basis of state law. Thank you.

21 THE COURT: It's your decision, Mr. Barger,

22 whether or not you want to put him on.

23 MR. BARGER: Well, at this time then, we would

24 like to call Mr. David Oeder.

25 (Witness sworn by the courtroom deputy.)

1    DAVID OEDER

2    DIRECT EXAMINATION

3  BY MR. BRADY:

4  Q.    Mr. Oeder, could you state your name and business

5  address for the record, please?

6  A.    David L. Oeder, 3980 Turtlecreek Road, Lebanon, Ohio.

7  Q.    Are you employed?

8  A.    Yes.

9  Q.    What's the nature of your employment?

10  A.    My title is vice president.  I do work sand and gravel

11  plant work, truck work.

12  Q.    So you work for Oeder & Sons Sand & Gravel?

13  A.    Yes.

14  Q.    You are the vice president?

15  A.    Right.

16  Q.    Would you describe for the Court the nature of the

17  business of Oeder & Sons?

18  A.    Oeder & Sons is in the trucking business, sand and

19  gravel business, at this location.  They're operating two

20  sand and gravel plants at this operation.  They lease out

21  property for an asphalt plant, a concrete plant, and

22  they've got a trucking business there.

23  Q.    Is one of the plants referred to as Miami View?

24  A.    The Miami View plant is a partnership with another

25  company or other people.  The Miami View operation is

1  actually owned by me, my brothers and my father, and we own

2  50 percent of the operation there.

3  Q.   Would you describe for the Court where it's physically

4  located?

5  A.   It's located on Mason Morrow Road.  I think it's

6  considered north of South Lebanon.

7  Q.   Does the plant itself -- is it contained within the

8  township or the village?

9  A.   The Miami View property actually is in Union Township,

10  and it actually touches the Village of South Lebanon.

11  Q.   For your trucks to gain ingress and egress to the

12  plant, do they need to come in through the village?

13  A.   Yes, they have to come through the village.

14  Q.   Now, at the plant, do you process raw aggregate

15  material?

16  A.   Right.

17  Q.   And that needs to be transported over to another plant

18  to be made into construction-grade material, correct?

19  A.   No.  At the plant, that's what we actually do.  We

20  process on that property.

21  Q.   So the aggregates are harvested from Miami View?

22  A.   Right.

23  Q.   And transported to the plant for processing?

24  A.   Right.

25  Q.   Since the ordinance has been in place, have you

1   noticed a decrease in your business?

2   A.   Not just the business, we are not able to get the

3   material to the plant from Miami View as quickly as we was

4   before.  It's over twice as far to go around, and we

5   haven't -- we haven't employed the employees or the trucks

6   to do it.

7   Q.   The ordinance in question was adopted in November of

8   2000, correct?

9   A.   I think that's about when it was.

10  Q.   In the year 2000, do you know how many ton of

11  aggregates were transported from Miami View to the

12  processing plant?

13  A.   In the year of 2000, I believe it was just about a

14  half million tons of material.

15  Q.   And this year how many ton of material have you been

16  able to transport?

17  A.   I don't know the exact amount, but it's between 200

18  and 250,000.

19  Q.   So your ability to process raw materials has been cut

20  approximately in half by this ordinance?

21          MR. DUNPHY:  Objection.

22          THE COURT:  I didn't hear your --

23          MR. DUNPHY:  I'm sorry.  Leading, Your Honor.

24          THE COURT:  Overruled.

25  BY MR. BRADY:

1  Q.   You can answer.

2  A.   Our capability of bringing material to the plant has

3  been cut in half.

4  Q.   Have you lost any customers as a result of your

5  inability to move material?

6  A.   We have lost one big customer.  As far as small

7  customers, I really don't know, but one big customer that

8  we have lost.

9        MR. BRADY:  No further questions, Your Honor.

10        THE COURT:  Do you wish to cross-examine?

11        MR. DUNPHY:  Yes, Your Honor.  Thank you.

12                CROSS-EXAMINATION

13  BY MR. DUNPHY:

14  Q.   Mr. Oeder, in the past, has your firm ever traveled

15  the route which is prohibited by the ordinance, that being

16  Lebanon Road and Snook Road and the third road who's name I

17  can't recall offhand?

18  A.   Yes.

19  Q.   And when in the past did you do that, sir?

20  A.   Before the ordinance was passed.  We have actually

21  used them roads probably for 25 years.

22  Q.   How about in the time period that this second plant

23  has been opened in the last two or three years that you

24  described; during that time period have you used those

25  roads that are prohibited by the resolution?

1  A.   Yes.  I made it a point to do that.

2  Q.   On how many occasions did you do that, sir?

3  A.   Well, I don't know the exact amount.  I put one truck,

4  I know, to using that road.

5  Q.   Just to make sure I understand what you're saying, the

6  best you can recall is that on one occasion --

7  A.   No.  One truck constantly.  Can I explain?

8       THE COURT:  Gentlemen, I have no idea what time

9  period you're talking about.

10      MR. DUNPHY:  Thank you, Your Honor.

11 BY MR. DUNPHY:

12 Q.   You have a current need to get from your -- what you

13 call your aggregate plant to the processing plant; is that

14 correct?

15 A.   It's actually the mining operation at Miami View to

16 the processing plant.

17 Q.   And one of those locations just opened up in the last

18 two or three years?

19 A.   Yes.  It's probably been about three years, the Miami

20 View.

21 Q.   So any need that you had to get from one location to

22 the other has just arisen in the last three years; is that

23 correct?

24 A.   Yes, but we did use the road long before that.

25 Q.   But your current problem and the problem that you

1  assert you have been damaged by is your inability to get

2  from one plant to the other, correct?

3  A.  Yes.

4  Q.  Now, you have an ability by different -- by a

5  different route to get from one location to the other

6  currently in spite of the resolution; is that correct?

7  A.  Yes, but it's twice as far.

8  Q.  It's about 7.2 miles; is that correct?

9  A.  Yes.  Yes.

10  Q.  And if you took the route over the prohibited

11  roadways, it would be about 3.6 miles; is that correct?

12  A.  I think I measured it at about 3 miles.

13  Q.  So the difference is between 3 and 7.2 miles; is that

14  correct?

15  A.  Yes.  Yes.

16  Q.  But, nevertheless, you have an alternate route

17  available to you currently other than the roadways

18  prohibited by the resolution, correct?

19  A.  Yes, we do.

20  Q.  Your dispute is that that creates additional

21  transportation costs for you; is that correct?

22  A.  Yes.

23  Q.  That current route is over state highways; isn't that

24  correct?

25  A.  Not all of it, just part of it.

1   Q.    It's primarily over state highways, is it not?

2          THE COURT:  I'm not sure what you mean by

3   "current route."  Which one are you referring to now?

4          MR. DUNPHY:  Thank you, Your Honor.

5   BY MR. DUNPHY:

6   Q.    The route that your trucks travel now from one

7   location to the other --

8          THE COURT:  You mean the 7.2 mile route?

9          MR. DUNPHY:  Yes, Your Honor.

10  BY MR. DUNPHY:

11  Q.    What route is that, what roadway?

12  A.    That would be Mason Morrow Road to Route 48 to Route

13  22 and 3 to Stubbs Mill Road and then back on Mason Morrow

14  Road again.

15  Q.    Okay.  That includes some US roadways; is that

16  correct?

17  A.    Yes.

18  Q.    And that includes some state highways; is that

19  correct?

20  A.    State Route 48 and US 22 and 3, yes.

21  Q.    And that includes some county roads; is that correct?

22  A.    Yes.

23  Q.    And you have an ability to travel at a much greater

24  speed over those highways than you would over the township

25  roads; isn't that correct?

1    A.    Yes.   Yes.   You can probably travel at a greater

2    speed.   Whether we do, it's probably not a lot greater

3    because of the way the terrain is over these roads.

4    Q.    What are the widths of your trucks, sir?

5    A.    Roughly about eight feet, I think.

6    Q.    From mirror to mirror?

7    A.    Mirror to mirror, gee, I don't know, probably a couple

8    feet more.

9         MR. DUNPHY:   Excuse me, Your Honor, if I may

10   obtain a tablet.   Thank you.

11   BY MR. DUNPHY:

12   Q.    And what is the unloaded weight of the vehicles that

13   you transport?

14   A.    Unloaded, we run a lot of different size trucks.   Some

15   of them probably weigh 22 to 25,000, and some of them go up

16   to about 30 to 32, maybe 34,000 unloaded, empty.

17   Q.    And what is the loaded weight of the vehicles when

18   you're carrying materials?

19   A.    They vary probably from 60,000 to 80,000.

20   Q.    And how many trucks daily do you run?

21   A.    From the Miami View operation to the plant, or total

22   trucks?

23   Q.    Between those two locations.

24   A.    We're trying to operate with about five dump trailers

25   and probably two or three straight trucks.

1    Q.   But you make about 300 trips a day; isn't that

2    correct?

3    A.   Now, I would have to set down and figure it up.  The

4    five dump trailers are hauling the long way around

5    approximately 12 loads, 10 to 12 loads each a day.  Going

6    the shorter route, they would probably do close to 20 loads

7    a day.

8    Q.   Okay.  In the past, you have indicated that it would

9    be about 300 trucks a day between those two locations.

10   Would that be a fair statement?

11   A.   I know the plant's operating about 25 hundred ton a

12   day, so it would probably be 100 truckloads coming in.

13   That would be equal to 200 going both directions probably

14   200 trips, and there could be more with the shorter

15   straight trucks in there, too.

16   Q.   Now, as you sit there today, are you able to provide

17   any testimony about this burden that you say is placed on

18   your business because of this difference between 3 miles

19   and 7.2 miles, how your competitors -- what their situation

20   is as to the distances they need to travel?  Do you have

21   any testimony regarding that?

22   A.   Well, we don't have a lot of competitors.  The Morrow

23   Gravel operation actually hauls out of Miami View also.

24   They're only traveling probably a mile and a half at the

25   most to their operation.  We're in the same business

1   they're in.  Now we're traveling from -- we went from 2.2

2   miles or 3 miles to 7.2 miles.

3   Q.   Do you have any other evidence regarding any

4   competitive disadvantage that you're at because of these

5   additional mileages?

6   A.   I know my gravel operation this year has probably run

7   empty more than it has ever in the past.

8   Q.   And upon what factual basis do you assert that is

9   related to this additional distance?

10  A.   We don't have the manpower to get the material to the

11  plant as needed.

12  Q.   And what's the relationship between the manpower and

13  the additional distance?

14  A.   I don't quite understand that.

15  Q.   Your claim is that this additional distance has

16  lessened your business?

17  A.   It's lessened our ability to make sand and gravel,

18  because we have not been able to get the material to the

19  operation.

20  Q.   But you can get the material to the operation.  The

21  only difference is that you have to travel 7.2 miles

22  instead of 3 miles, correct?

23  A.   Yes, and employ more employees, or we would have to.

24  Q.   Now, your losses that you assert are associated with

25  this, that would be in additional transportation costs; is

1    that correct?

2    A.    Yes.

3    Q.    That would be in additional wages paid, correct?

4    A.    Right.

5    Q.    And those are all -- those are both issues which you

6    can sit down and calculate what that loss would be; is that

7    correct?

8    A.    Yes.

9         MR. DUNPHY:  I believe that's all the questions I

10   have, Your Honor.  Thank you.

11        THE COURT:  Thank you, Mr. Dunphy.

12        Do you have any redirect, Mr. Brady?

13        MR. BRADY:  Just a few, Your Honor.

14                    REDIRECT EXAMINATION

15   BY MR. BRADY:

16   Q.    David, in talking about the cost to Oeder & Sons of

17   this ordinance, the real cost here is time; isn't that

18   correct?

19   A.    Yes.

20   Q.    It takes longer now for to you move aggregates from

21   the harvest site to the processing plant?

22   A.    Right.

23   Q.    For you to be able to do the business that you were

24   doing before the ordinance went into effect, would you need

25   to increase both the number of employees and the capital?

1  A.   Yes.

2  Q.   You would need to buy more trucks?

3  A.   Right.

4  Q.   You would need to add more people?

5  A.   Right.

6  Q.   Counsel asked you if you could calculate how much it

7  cost to buy more trucks, to add more people.  Can you

8  calculate the loss to your business of unknown customers

9  that you lose?

10 A.   I don't think you could do that.

11 Q.   Can you calculate the loss to your business of the

12 large customer you lost?

13 A.   I could maybe get close from what we did not sell him

14 that we have sold him in the past.

15 Q.   But you have no idea of what business would flourish

16 in the future?

17 A.   No.

18          MR. BRADY:  Thank you.  That's all.

19          THE COURT:  Anything further, Mr. Dunphy?

20          MR. DUNPHY:  No, Your Honor.

21          THE COURT:  Thank you, Mr. Oeder.  You're

22 excused.

23          Anything further from the plaintiff?

24          MR. BARGER:  No, Your Honor.

25          THE COURT:  Mr. Dunphy?

1    MR. DUNPHY: Yes, Your Honor.  I would call Skip
2  Lawhorn to the stand, Your Honor.
3         (Witness sworn by the courtroom deputy.)
4                    LIONEL LAWHORN
5                  DIRECT EXAMINATION
6  BY MR. DUNPHY:
7  Q.   Would you please state your full name, sir?
8  A.   Lionel Lawhorn.
9  Q.   And you have something you're called by other than
10  Lionel?
11  A.   Everyone calls me Skip.
12  Q.   How are you employed, sir?
13  A.   I'm an investigator for the Hamilton County Corner's
14  Office.  I'm also an elected official.  I'm a Union
15  Township trustee in Warren County.
16  Q.   Before your current employment, how were you employed?
17  A.   I was employed by the State of Ohio, the highway
18  patrol, for 28 years.
19  Q.   In what capacity?
20  A.   For the first 20 years I was a uniformed patrol
21  officer.  For the last eight years I was a criminal
22  investigator.
23  Q.   How long have you been a Union Township trustee?
24  A.   I'm getting ready to start my fourth four-year term.
25  Q.   And so you would have been on the board of trustees on

1  November 20th or November of the year 2000?

2  A.   That is correct.

3  Q.   And did you participate in the decision to pass the

4  resolution which is the subject of this motion?

5  A.   Yes, I did.

6  Q.   And who else participated in that?

7  A.   The other two trustees, John Louallen and Russell

8  Kilburn.

9  Q.   And prior to the passage of that resolution, was there

10  a public meeting with respect to the resolution?

11  A.   Yes.

12  Q.   And tell me briefly about the public meeting.   Who

13  was --

14  A.   Union Township is a small township, and, if we ever

15  have one or two people come to one of our meetings, that's

16  a lot.

17       THE COURT:  Let me just ask you a quick question.

18  How big is the township?  Do you know how many people live

19  there?

20       THE WITNESS:  We're less than 5,000 population.

21  We're about 19 square miles.

22       THE COURT:  Nineteen square miles and about 5,000

23  people.

24       THE WITNESS:  Yes.

25       MR. DUNPHY:  Thank you, Your Honor.

1       THE WITNESS:  At the night that we had a public

2   hearing, we had probably 30, 40 people in.  Our meeting

3   room was packed.

4   BY MR. DUNPHY:

5   Q.   And at some point prior to the public meeting at which

6   the resolution was passed, did it come to your attention as

7   trustee that there was an issue that needed to be addressed

8   with respect to truck travel on particular roadways in the

9   township?

10  A.   Yes, there did.

11  Q.   Just briefly, how did that come to your attention?

12  A.   Around this time, the Village of South Lebanon, which

13  is located in that geographical area, also were talking

14  about passing an ordinance to eliminate trucks, through

15  trucks, through the village and having a truck route

16  around.  And I had gone to a public hearing at the village

17  about that passage or what the public thought about it.

18  And Mr. David Oeder was at that hearing, and I heard him

19  testify that -- the village testified that they had done a

20  traffic count for an 8-hour period of trucks of tandem axle

21  and larger.  And during that 8-hour period, there was more

22  than 400 tandem axle trucks or bigger had gone through the

23  village on the existing truck route.

24       MR. DONNELLON:  Objection, Your Honor.  Hearsay

25  as to what occurred at a public meeting and what was

1   discussed at another.

2           THE COURT:  Mr. Donnellon is correct.

3           MR. DUNPHY:  Yes, Your Honor.

4   BY MR. DUNPHY:

5   Q.   You indicated that the plaintiff was also present and

6   testified at that hearing?

7   A.   Yes.

8   Q.   What did the plaintiff say with respect to truck

9   travel?

10  A.   He said that more than 300 of those trucks were Oeder

11  & Sons trucks.

12  Q.   Okay.  Now, have you become -- are you familiar with

13  the truck route currently used by Oeder & Sons?

14  A.   Yes.

15  Q.   And would you describe that route that's currently

16  used in the face of or with the resolution of the township

17  in place now?

18  A.   The truck route that's used now, their processing

19  plant is on the west side of South Lebanon.  Actually, the

20  street in front of it now is a village street.  It used to

21  be a county road.  It's a wide county road.  It's good

22  pavement.  They go from there.  They go to State Route 48,

23  which is a concrete highway in that general area.  They go

24  south on State Route 48 to US 22 and State Route 3.  They

25  make a left and go northeast on US 22 and 3 to another

1  county road, Stubbs Mill Road. They go a short distance on

2  Stubbs Mill Road, and then they go back on the county road,

3  and that's Mason Morrow Millgrove Road.

4  Q.  And are you also familiar with the roadways that are

5  the subject of the resolution that, presumably, the trucks

6  would travel --

7  A.  Yes.

8  Q.  -- through the township? Would you describe those

9  roads?

10  A.  They are all adjoining or connected roadways. It's

11  not that Snook Road is over here and Dry Run is here.

12  They're all connecting roadways. Snook Road runs north and

13  south, and then it turns. That's a 90-degree turn. And it

14  goes a short distance to the west, and it runs into Dry Run

15  Road. Then Dry Run Road continues on, and it continues,

16  which is Kirby Road. It goes to Lebanon Road, which

17  dead-ends. And then Lebanon Road, which used to be State

18  Route 48, runs north and south, and they're all adjoining.

19  It's like a "U" shape that Snook, Dry Run and Lebanon Road

20  consist of.

21  Q.  Could you generally describe the width of these

22  roadways?

23  A.  State Route -- the old State Route 48 is probably the

24  widest, and it's probably 22 feet wide, approximately. It

25  is also residential. Then you go to Dry Run Road, which is

1   a country road that's probably approximately 18 to 20 feet

2   wide.  Then you go back to Snook Road, which is another

3   residential street that's probably 18 to 20 feet wide.

4   Q.   And what has been done in the recent past with respect

5   to improvement or maintenance of these roadways?

6           THE COURT:   I'm sorry.   I missed the last part of

7   your question.

8           MR. DUNPHY:   With respect to maintenance or

9   improvement of the roadways.

10  A.   Prior to about three years ago, this roadway was

11  maintained by tar and chip.

12  Q.   What is that?

13  A.   It is they put down a mixture, and I can't tell you

14  exactly what that mixture is.   It's a sticky substance.

15  And then they put fine gravel, chip gravel, over top of it,

16  and that's all the roads were ever done.   And about three

17  years ago, we had an inch and a half blacktop put on the

18  roadway over Dry Run and Snook Road.

19  Q.   What was the cost to the township of that?

20  A.   It was around $55,000 to have that done.

21  Q.   Now, you indicated that some of these roadways are

22  residential areas?

23  A.   Snook Road and Lebanon Road are residential areas.

24  Q.   And are there families that live in the residential

25  areas?

1  A.   Yes.

2  Q.   Are there children that live in those residential

3  areas?

4  A.   Yes.

5  Q.   The areas that are contained within those roadways,

6  are they contained within one or more public school

7  districts?

8  A.   Yes.

9  Q.   And what public school district?

10  A.   It's the Kings School District and the Lebanon School

11  District.

12  Q.   And do buses from those public school districts drop

13  off and pick up children in the area of the roadways that

14  are the subject of this resolution?

15  A.   Yes, they do.

16  Q.   I'm going to try and show you here, sir, what has been

17  marked for identification purposes as Defense Exhibit A.

18          THE COURT:  If you want to get down.

19          MR. DUNPHY:  Thank you, Your Honor.

20  Q.   Can you point out, Mr. Lawhorn, first of all, where

21  the location of the two plants are for Oeder & Sons?  And

22  tell me if I need to enlarge or reduce this.

23  A.   Well, I have to look here a little bit.  The one, the

24  gravel processing -- not the processing, but the mining

25  location is in the general area here in between Stubbs Mill

1  Road and the Village of South Lebanon.  This is Stubbs Mill

2  Road, and right in here would be the corporate limit of

3  South Lebanon.

4           THE COURT:  What is referred to as Miami View, in

5  other words?

6           THE WITNESS:  That's -- what that is is a mining

7  operation.

8           THE COURT:  Right.

9           THE WITNESS:  And it is in that general area.

10 BY MR. DUNPHY:

11 Q.   And then the second location, where is that?

12 A.   It is west of -- I'm trying to see here --

13           THE COURT:  Might be easier to come down here,

14 Mr. Lawhorn.

15 A.   It's a little blurry.  It's west of South Lebanon

16 anyway, and it's west of State Route 48.  It's in this

17 general area over here where Turtle Creek is.

18 Q.   And could you just depict the current route as you

19 understand it?

20 A.   You can't see it all, because State Route 48 goes down

21 to the intersection of US 22, which is here.  It goes back

22 up to Stubbs Mill Road, up Stubbs Mill to Mason Morrow

23 Millgrove and then over to the mining.

24 Q.   Could you demonstrate the route that presumably would

25 be taken through the township roads?

1  A.    It's a little blurry.

2          THE COURT:  Is there a focus on here, Steve.

3          (Adjusting focus on visualizer.)

4  A.    That's really good.  The actual truck, the prohibition

5  of the trucks doesn't start until right here.  This is

6  Snook and Shawhan Road that comes up here, and Shawhan Road

7  goes -- comes up to the right.  The actual prohibition

8  starts here at the intersection of Shawhan Road and Snook

9  Road.  It goes up Snook, and Snook makes this turn to Dry

10 Run, and this is where Dry Run starts.  Also, Dry Run goes

11 up in there, but it goes around, and it comes over to

12 Lebanon Road, and then it comes back to Mason Morrow

13 Millgrove Road and over to the processing plant.  So it's

14 just -- it's three roadways, but they're all adjoining.

15 Q.    Okay.  Does Exhibit A fairly and accurately depict

16 this area geographically?

17 A.    Yes.

18 Q.    I'm going to show you a few photographs if you are

19 able to identify what these are, Mr. Lawhorn.  Showing you

20 what's been marked for identification purposes as Defense

21 Exhibit B, are you able to identify what that is?

22 A.    This is Lebanon Road, Old State Route 48, looking

23 back, looking south toward Mason Morrow Millgrove Road.  If

24 you can see these buildings down here, Mason Morrow

25 Millgrove Road runs east-west here, and this dead-ends into

1  it.

2  Q.   So this is a depiction of one of the roadways the

3  resolution pertains to?

4  A.   Yes.

5  Q.   Is there some bridge work here depicted in this

6  photograph?

7  A.   Yeah.  This is a short span bridge, around

8  approximately ten feet.

9  Q.   Then showing you Exhibit C, can you identify what that

10  is?

11  A.   Yes.  This is looking from the south on Lebanon Road

12  looking towards the north.  Lebanon Road continues on to

13  the left and dead-ends into Interstate 71, and Dry Run Road

14  starts here.

15  Q.   And the structures?

16  A.   This is a residential.  This is part of a motel, and

17  then over here is also.

18  Q.   Then showing you Exhibit D, can you identify what that

19  is?

20  A.   This is the same intersection.  You can see that Dry

21  Run Road goes this way, and that's the area that we were

22  talking about.  This is the motel that's right along the

23  edge of the roadway here.

24  Q.   And Exhibit E?

25  A.   This is the dead end of Lebanon Road that dead-ends

1   into Interstate 71.

2   Q.   Exhibit F?

3   A.   This is looking after you come down Snook Road, down

4   the hill and that 90-degree turn that I showed, it comes up

5   to this bridge, and this is Dry Run Road here, and it goes

6   up in here and dead-ends, Dry Run does. But this is where

7   Snook Road ends.

8   Q.   Okay. And Exhibit G?

9   A.   It's just a little further back. It's the same.

10   Q.   H?

11   A.   This is Snook Road. This is a hill that goes down --

12   from where the prohibition for the trucks starts, it's a

13   flat street that runs along in a residential area, and then

14   it comes to this hill, and it goes down. It's a curvy

15   hill, and this is about halfway down the hill.

16   Q.   And then I?

17   A.   This is coming down the hill to that 90-degree turn.

18   This is the turn on Snook Road. This is a private

19   driveway.

20   Q.   Let's talk about this turn particularly but also

21   generally with respect to other turns on this route that

22   has been prohibited by the resolution. You are familiar

23   with these roadways?

24   A.   Yes.

25   Q.   You're familiar with their widths?

1  A.    Yes.

2  Q.    Are you familiar in general with the widths of the

3  trucks, at least of Mr. Oeder, as well as similar trucks?

4  A.    Yes.

5  Q.    You're familiar with buses?

6  A.    Yes.

7  Q.    School buses that go through the area?

8  A.    Yes.

9  Q.    Would a truck of the nature that the resolution

10  relates to, would it be able to make this turn without

11  crossing the center line?

12  A.    Not without running off the roadway.

13          MR. BARGER:  Object to all of them.  Leading.

14          THE COURT:  Sustained.

15  BY MR. DUNPHY:

16  Q.    Explain what your experience has been with respect to

17  the ability of trucks of this nature to negotiate this

18  turn?

19  A.    For twenty years, I regulated traffic in the State of

20  Ohio and investigated accidents.  I investigated trucks.  I

21  have seen what trucks do.  I have watched them for 20

22  years.

23          THE COURT:  All right.

24  Q.    How about with respect to the ability of cars passing,

25  cars passing each other on this roadway, describe your

1 experience with that with these roadways.

2 A.   On this curve, none could run the speed limit on this

3 curve and pass.  They can't do it without going left of

4 center either, I don't think.  It's a sharp curve.  It's a

5 narrow roadway.

6          THE COURT:  What is the speed limit there,

7 Mr. Lawhorn?

8          THE WITNESS:  It's not posted.  Outside of a

9 municipal corporation in the State of Ohio it's 55 miles an

10 hour.

11 BY MR. DUNPHY:

12 Q.   And have you any experience with respect to the

13 passing of buses on these roadways?  What's your knowledge

14 of that?

15 A.   Buses can't go around the curves either without going

16 left of center as far as I know, the school buses.

17 Q.   And then Exhibit J, what is that?

18 A.   This is the hill that we were looking this way, and

19 this is coming down a curve.  This is another short span

20 bridge partially down the hill.  We haven't got to the

21 curve, the 90-degree one.  This is just another one in that

22 hill.

23 Q.   All of these photographs that I have asked you to

24 identify, Exhibits B through J, do they fairly and

25 accurately depict those portions of the roadway that you

1  were describing?

2  A.    Yes.

3           MR. DUNPHY:  I believe we have finished with

4  that, Your Honor.  The witness could return to the stand.

5  Q.    Did you vote for passage of the resolution that's in

6  question?

7  A.    Yes.

8  Q.    How many members of the board of trustees are there?

9  A.    Three.

10 Q.    How many members of the board of trustees passed the

11 resolution?

12 A.    Three.

13 Q.    And what was the concern or what was the board of

14 trustees trying to address, what issues, what concerns did

15 they have in passing the resolution?

16 A.    There was probably different concerns.  We have a

17 concern with the roadway of being able to maintain it.

18 There is no drainage.  The base of it is not very good.  We

19 knew that it wouldn't withstand the weight of those trucks

20 and that many trucks.  One of my big concerns with my

21 history in the past, in my past employment, was safety,

22 that it wouldn't be safe for those vehicles to traverse

23 those roadways.

24 Q.    What was it about -- what concerns about safety did

25 you have?

1    A.    Well, we have the buses, and knowing that the curves

2    on those roadways, that without running off the roadway,

3    and there is not much roadway to run off of after you get

4    off the roadway, that that was going to cause accidents.

5              MR. BARGER:  Objection, Your Honor.  We would

6    pose an objection to the entire line of questioning with

7    respect to safety issues and the like for the reason that,

8    if the township didn't have the authority to pass any type

9    of regulation, that it's immaterial what their motive was

10   for doing this.

11             THE COURT:  I understand, and I think that's the

12   ultimate question for the Court, if the township had

13   authority to do this or not.  And I agree with you.  If the

14   township didn't have authority to do it, then,

15   unfortunately, the safety issue is irrelevant.

16             But I appreciate the motivation of the trustees,

17   and I'm interested to hear it.

18   BY MR. DUNPHY:

19   Q.    In the time period since the opening of the second

20   location, as far as you understand it from your own

21   personal knowledge of Oeder, have trucks traveled that

22   route that is the subject of the resolution?

23   A.    No.  No.

24             MR. DUNPHY:  That's all I have.

25             THE COURT:  Thank you.

1    Do you wish to cross-examine?

2    MR. BARGER:  Yes, Your Honor.

3    CROSS-EXAMINATION

4  BY MR. BARGER:

5  Q.   You indicated a moment ago, Mr. Lawhorn, that the

6  township didn't regulate the speed on that one particular

7  road.  You said the speed limit was 55 miles an hour?

8  A.   Outside of a municipal corporation, unposted or

9  posted, it's 55 miles an hour by state law.

10  Q.   Does the township have any authority to regulate that

11  law?

12  A.   Not in that area.

13    MR. DUNPHY:  Objection, Your Honor.  It calls for

14  a legal conclusion.

15    THE COURT:  Overruled.

16    MR. DUNPHY:  Thank you, Your Honor.

17  BY MR. BARGER:

18  Q.   Does the township?

19  A.   We could ask the county commissioners to address the

20  Ohio Department of Transportation to try to reduce it, but

21  there is certain specifications that we have to go by by

22  number of residents or businesses, and that area doesn't

23  come under that.  It won't hold up.

24  Q.   And isn't it true that the county commissioners

25  determine the weight limits on the roads in the county and

1   the township?

2   A.   I don't know that to be true, because I was told that

3   we could regulate it by the prosecutor's office.

4   Q.   Did he cite you to any specific authority in the

5   revised code?

6   A.   There is a little more to this story than what's come

7   out so far.  The section of law we used, the townships have

8   the county engineers and to advise us on roadways and

9   bridges and things such as that.  And the townships have

10  the prosecutor's office, and it's a state law that they

11  advise legal matters.  What started this and why we used

12  that section of law was that I went to the Warren County

13  Engineer.

14  Q.   Excuse me.  Which section of law are you referring to?

15  A.   The 4511.07(I).

16  Q.   My question is:  Independent of 4511.07(I), does the

17  township have any authority that you can point to to

18  regulate the weight of trucks, vehicular traffic on

19  township or county roads?

20          MR. DUNPHY:  Objection.  Same basis.

21          THE COURT:  You can answer if you know.  It does

22  call for a legal conclusion.

23  A.   I just felt that we had been advised that we could by

24  that section of law.

25  Q.   With respect to the maintenance on the road, has the

1  township employed any experts or consultants to advise them

2  concerning the maintenance schedule of the road that

3  apparently three years ago you put asphalt on?

4  A.   No.

5  Q.   To your knowledge, has Oeder & Sons received any

6  tickets while traveling on the three roads that are

7  prohibited?

8         THE COURT:  During what period of time?

9         MR. BARGER:  Prior to the prohibition of the

10  right.

11  A.   I have no knowledge of that, no.

12  Q.   Did you check with anyone, any sheriff or police

13  authority, to determine whether they had?

14  A.   No.

15  Q.   To your knowledge, has Oeder & Sons been involved in

16  any accidents on those roads prior to the prohibition?

17  A.   To my knowledge, no.

18         MR. BARGER:  Thank you.  No further questions.

19         THE COURT:  Anything further, Mr. Dunphy?

20         MR. DUNPHY:  No, Your Honor.

21         THE COURT:  The Court appreciates your

22  testifying, Mr. Lawhorn.  You are excused.

23         Anything further, Mr. Dunphy?

24         MR. DUNPHY:  I have one more witness, Your Honor.

25  His name is Harry Herbst.  He's in the witness room.  I

1  will get him.

2          (Witness sworn by the courtroom deputy.)

3          MR. DUNPHY:  May I proceed, Your Honor?

4          THE COURT:  Yes.  Go ahead.

5                  HARRY G. HERBST

6                DIRECT EXAMINATION

7  BY MR. DUNPHY:

8  Q.    Would you please state your full name, sir?

9  A.    Harry G. Herbst, III.

10  Q.    And how are you employed, sir?

11  A.    I'm employed as a civil engineer.

12  Q.    And where are you employed, sir?

13  A.    Employed in Dayton, Ohio.

14  Q.    And what is the name of your firm?

15  A.    The name of the firm is LJB, which stands for

16  Lockwood, Jones & Beals.

17  Q.    What is LJB?

18  A.    LJB is a civil and structural engineering firm.  We

19  also have architectural and surveying expertise.

20  Q.    And do you count among your clients any political

21  subdivisions?

22  A.    Yes, we do.  We have clients, political subdivisions,

23  that range from the United States of America, the State of

24  Ohio, many county, city and village and township

25  governments.

1   Q.   And do you advise your political subdivision clients

2   with respect to roadways and, in particular, with respect

3   to pavement?

4   A.   Yes, we do.  We design roadways and pavements.  We

5   assist our clients with evaluating existing roadways and

6   pavements.  We also do studies and apply for grants for

7   upgrading their roadways and pavements.

8   Q.   And where did you receive your engineering education,

9   sir?

10  A.   I attended the University of Cincinnati for four

11  years.

12  Q.   Okay.  And are you licensed in any state as a

13  professional engineer?

14  A.   I'm licensed in the State of Kentucky as a

15  professional engineer.

16  Q.   And would you please relate to the Court what your

17  particular involvement has been with respect to roadways

18  and particularly with respect to issues of pavement?

19  A.   With respect to roadways and pavements, I have

20  designed projects for the State of Ohio.  I have designed

21  projects for smaller communities, cities and villages.  I

22  have also reviewed plans of other engineers with respect to

23  the construction of public improvements such as for

24  subdivision plats and other roadway improvements in cities

25  and villages that we work for.

1  Q.   And how long have you been employed or engaged in the

2  services of a civil engineer?

3  A.   I've worked for LJB since 1974.

4  Q.   Now, in the course of your business, did you have an

5  occasion to do some work on behalf of Union Township

6  located in Warren County, Ohio?

7  A.   Yes, we did.

8  Q.   And what was the nature of the work that you performed

9  for Union Township?

10 A.   We received a call from Union Township.  They asked us

11 to look at two sections of roadway, Dry Run and Snook Road,

12 that basically bypass the Village of South Lebanon and to

13 review those roadways with respect to the potential for

14 heavy truck traffic.

15 Q.   Now, during the course of -- at some point, have you

16 become familiar with a resolution of the Union Township

17 Board of Trustees of November 20th of 2000 prohibiting

18 vehicles weighing over 20,000 pounds from using Snook Road

19 and Dry Run Road or Lebanon Road?

20      MR. BARGER:  Objection.  Your Honor, I restate

21 the objection that we stated earlier with respect to the --

22 essentially, regardless of whatever studies and the like

23 they have done, this is simply not relevant to the issue of

24 their authority to pass such a resolution.

25      THE COURT:  I understand your objection.  Since

1    it's a matter that is being tried to the Court, I'll allow

2    it.

3              MR. BARGER:  All right.

4              THE COURT:  You may proceed.

5              THE WITNESS:  Could you repeat the question,

6    please?

7    BY MR. DUNPHY:

8    Q.    At some point, did you become aware of a resolution

9    passed by the Union Township Board of Trustees on November

10   20th, 2000, prohibiting vehicles weighing over 20,000

11   pounds from using Snook Road, Dry Run Road or Lebanon Road?

12   A.    We were aware that they had passed that resolution;

13   that is correct.

14   Q.    And as a part of your work for Union Township, did you

15   personally go and inspect those roadways?

16   A.    Yes.  Myself and two other people from our office,

17   approximately the last week of November, viewed that

18   roadway with the specific task of reviewing that roadway

19   with respect to that ordinance; that is correct.

20   Q.    And would you describe what you did during the course

21   of that work?

22   A.    We visited the roadway.  We drove the entire length.

23   We periodically stopped, made measurements of the roadway

24   width.  We did also view several of the culverts that are

25   on that roadway.  We took pictures at various locations

1  along the roadway.

2  Q.   Okay.  Now, could you generally describe those

3  roadways?

4  A.   The roadway itself appeared to have recently been

5  paved, and, when I say recently, within the last several

6  years, with a new course of asphalt.  The asphalt, at this

7  point in time, appeared to be in relatively good condition.

8  We also viewed some of the culverts that seemed to be in

9  marginal condition.  We did review the roadway with regard

10  to signage, with regard to pavement markings, and with

11  regard to pavement condition.

12  Q.   Did you also conduct some counts, traffic counts?

13  A.   Subsequent to our visit in November, we did put out

14  traffic counters for a period of three or four days and did

15  count the existing traffic that travels on those roadways.

16  Q.   And what were the results of those traffic counts?

17  A.   The results of the traffic counts indicated that the

18  existing traffic varies in the neighborhood of 600 to 800

19  vehicles per day with no heavy trucks.  There were some

20  larger vehicles, but they were generally lighter vehicles

21  on that roadway.

22  Q.   Okay.  And did you draw some conclusions with respect

23  to how the pavement was withstanding that traffic?

24  A.   The pavement currently seems to be standing up to the

25  light traffic that's on the roadway.

1  Q.   And that's how you would describe the traffic, as

2  being light?

3  A.   That is correct.  Anything less than a thousand cars

4  or a thousand vehicles per day is considered to be a low

5  traffic count.  Vehicles of the nature that our counters

6  sensed on that roadway were lighter vehicles, were not

7  heavy trucks.

8  Q.   Did you make any observations with respect to

9  drainage?

10  A.   Yes, we did.  When we visited the roadway and drove

11  it, I observed that there were no comprehensive systems of

12  ditches to be able to remove rainwater and surface water.

13  Generally, a good pavement design would include removing

14  not only surface water, but subsurface water.  The day we

15  were there, we observed that there were many areas that the

16  ground was saturated adjacent to the pavement, even a

17  couple areas where there was actually water standing on the

18  pavement.

19  Q.   And what, if any, relationship is there with pavement

20  maintenance, the weight of vehicles, and drainage?

21  A.   Pavement, to be able to perform adequately, needs to

22  transmit the loads of the vehicles that pass over the

23  pavement into the subgrade or into the soil below the

24  pavement.  So, if the soil and the subgrade below the

25  pavement is saturated, it's going to soften those soils.

1  Those will lead to a condition where those soils are not

2  able to support the loads, which will then allow the

3  pavement to begin to deflect and eventually will damage the

4  pavement.

5  Q.    Now, did you draw any conclusion with respect to the

6  expected life of the pavement on these roadways under the

7  current traffic conditions?

8  A.    Under the current traffic conditions, the existing

9  roadway historically has been a township road.  It has

10  grown up based upon the experience of the township that

11  they would provide maintenance, that they would provide

12  improvements in response to the deterioration of the

13  existing pavement.  So, in other words, what's been built

14  out there has been built to support the existing traffic

15  counts and the existing traffic that's out there.

16      From the visual inspection, it's my sense that that

17  pavement is probably adequate to handle the existing

18  traffic and the existing loading that's placed upon it.

19  Q.    And you may have already indicated, but what does --

20  what are your conclusions with respect to the life

21  expectancy of that roadway as it is now under current

22  conditions?

23  A.    Generally, asphalt pavement overlays, which is the

24  surface layer, are expected to last eight to ten years,

25  possibly a little longer on a light duty roadway.  And

1  based upon the fact that the new pavement, that we have new

2  pavement out there that's about two years old, it appeared,

3  and I would expect, that that pavement would fall in the

4  normal life cycle for that type of a pavement of eight to

5  ten years.

6  Q.   Is that an opinion you hold within a reasonable degree

7  of engineering certainty?

8  A.   Yes, sir.

9  Q.   Is that based upon your training, education,

10 experience and your personal observations?

11 A.   Yes, it is.

12        MR. DUNPHY:  Okay.  May I approach the witness

13 for just a moment, Your Honor, just to have him look at

14 photographs?

15        THE COURT:  Are those the photographs you have

16 previously displayed?

17        MR. DUNPHY:  Yes.  I just want him to identify

18 them as photographs he had taken.

19        THE COURT:  Are they the ones you gave

20 Mr. Lawhorn?

21        MR. DUNPHY:  Yes, Your Honor.

22 BY MR. DUNPHY:

23 Q.   Showing you what's been marked for identification

24 purposes as Defense Exhibits B through J, if you would take

25 a look at those, Mr. Herbst, and tell me what those are.

1   A.   These are photographs that we took the day that we

2   visited the roadway at various locations along the roadway.

3   Q.   Now, do you have an opinion within reasonable

4   engineering certainty, based upon your training, education,

5   experience and your personal investigation of these

6   roadways, as to what effect, if any, the travel of vehicles

7   weighing over 200 -- or over 20,000 pounds would have on

8   the pavement?

9   A.   The existing pavement is a relatively light pavement.

10  If we begin to pass heavy trucks approaching the legal

11  limits in Ohio over that pavement, those loads will begin

12  to deflect the pavement, will begin to deflect the

13  subgrade.  Those loads will begin to work the subsoil,

14  since it obviously is soft.  It will begin to work the

15  subsoil up into the gravel substructure of the pavement.

16  Once that begins to happen, the load-carrying capacity of

17  the gravel will begin to disappear and eventually will

18  begin to crack and break up the asphalt surface layer of

19  that roadway.

20  Q.   Okay.  And do you have an opinion within reasonable

21  engineering certainty as to the time frame of that

22  deterioration based upon your training, education,

23  experience and your personal investigation?

24  A.   In my opinion, that roadway would begin to deflect and

25  break up within a matter of weeks or months.  It would be a

1    very short time period.

2    Q.   Did you also have an occasion to view some of the

3    bridges or -- strike that.  Did you have an occasion to

4    investigate whether or not there are any bridges along

5    those roadways?

6    A.   On the day that we were there, we found three bridges

7    or culverts.  One was new, and the other two were older

8    structures that actually had been widened and added to over

9    the years.

10    Q.   Okay.  And what, if anything, did you observe about

11    the bridges?

12    A.   We were somewhat concerned about the condition of the

13    two older structures.  There appeared to be some

14    deterioration.  The first structure, which was at the --

15    was on Dry Run, appeared to have more deterioration than

16    the other structure on up further north.  And we were

17    concerned that those would be able to carry fully loaded

18    truck vehicles on a frequent basis.

19    Q.   Do have an opinion within reasonable engineering

20    certainty or a recommendation as to whether or not Union

21    Township should permit vehicles in excess of 20,000 pounds

22    from traveling over those roadways?

23    A.   It's my opinion that Union Township should not permit

24    vehicles over 20,000 pounds on that roadway.

25          MR. BARGER:  Objection.

1          THE COURT:  I understand the objection and I'm

2    sure the premise, on whether or not Union Township has the

3    authority to do that.

4          MR. BARGER:  Yes.

5          MR. DUNPHY:  May I have just a moment, Your

6    Honor?

7          THE COURT:  Yes.

8          MR. DUNPHY:  I believe that's all of the

9    questions I have.

10         THE COURT:  Do you wish to cross-examine this

11   witness?

12         MR. BARGER:  Not at this time, Your Honor, but I

13   would like to reserve the right to cross-examine him at a

14   future proceeding.

15         THE COURT:  All right.  You are excused, sir.

16   Thank you.

17         Anything further, Mr. Dunphy?

18         MR. DUNPHY:  I would just move for the admission

19   of the exhibits, Your Honor, which would be map A and the

20   photographs.

21         THE COURT:  Any objection?

22         MR. DONNELLON:  No objection to admission of the

23   exhibits, Your Honor.

24         THE COURT:  All right.  Exhibits A through J will

25   be admitted.

1        MR. DUNPHY:  We would rest, Your Honor.

2        THE COURT:  All right.  Anything further from the

3   plaintiff?

4        MR. BARGER:  We have no further witnesses.

5        THE COURT:  All right.  Do you wish to make

6   closing arguments?

7        MR. BARGER:  Yes, Your Honor.

8        THE COURT:  All right.  You may proceed.

9        Actually, you know what, Mr. Barger?  I would

10   actually like to hear from Mr. Dunphy first, and then I

11   will give you an opportunity to respond.

12        Mr. Dunphy, essentially this comes down to an

13   issue -- I understand the interests at stake here.  We have

14   a company who is certainly financially aggrieved by what

15   the township has done, and they want to be able to go over

16   the same roads they went on before.  I understand what this

17   does to the township.  I understand they repaved the roads

18   in the last few years.  It will certainly deteriorate

19   sooner, cause some safety issues.  I completely understand

20   where the township trustees are coming from.  I understand

21   the varying interests here.

22        But I guess the only question I'm allowed to

23   decide is does the township have the legal authority to do

24   this, and that's what I would like you to address, since I

25   haven't seen your pleading.

1    MR. DUNPHY:  Yes, Your Honor.  I guess I would

2  start with what I view as some assumptions about what the

3  plaintiffs are asserting and based upon what I think the

4  assumptions the Court is going on based upon what

5  apparently the plaintiff is asserting.  And I would like to

6  address one issue that doesn't seem to fit into the

7  plaintiff's argument, but, nevertheless, the plaintiff's

8  application appears to revolve strictly around state law

9  concerns and strictly around the issue of the statutory

10  authority for the passing of the resolution.

11    THE COURT:  I think counsel would agree with

12  that, wouldn't you?

13    MR. BARGER:  Yes.

14    MR. DUNPHY:  So I assume that means that there is

15  no issue as to whether or not there is a rational basis for

16  the passing of the resolution and whether or not it bears a

17  real and substantial relationship to a legitimate state

18  goal.

19    The reason I say that, Your Honor, because

20  counsel referred to an issue of the right to travel, and of

21  course that issue, assuming a right to travel applies,

22  raises a different scrutiny for the Court, a strict

23  scrutiny as opposed to a rational basis scrutiny.

24    Just very briefly, I don't think the plaintiffs

25  are really making that argument, at least in this

1    application.

2    THE COURT:  I agree with that.  I don't think

3    they are either.

4    MR. DUNPHY:  I would say that the right to travel

5    has no application in any event.  Its precepts simply don't

6    apply.

7    Now, the case that Plaintiffs are relying upon is

8    the Geauga County case.  I'm sorry about the pronunciation,

9    Your Honor.  I'm not really sure how you pronounce that

10   county.

11   THE COURT:  I think it's Geauga.

12   MR. DUNPHY:  Geauga.  And I submit, Your Honor,

13   that that case has a very limited holding, and that limited

14   holding is that 4511.07(I) does not grant authority to a

15   county to regulate traffic.  I would argue, first of all,

16   that it doesn't relate to townships, although I think

17   counsel has an argument that, by extension, it should.  But

18   it really does not -- it does, for example, what it really

19   doesn't do, what it clearly doesn't do, it doesn't address

20   the issue of whether a county could have otherwise

21   regulated traffic.  It does not address that issue.  The

22   only issue before the Court is 4511.07(I); was that a grant

23   of authority to regulate traffic?  And the Court said, no,

24   it wasn't because of the language of the statute.

25   So, even assuming that that basic holding extends

1   to townships, that 4511.07(I) does not grant authority to a

2   township to regulate traffic, I submit that that doesn't

3   answer the question.  If the Court determines that this

4   case should be extended and therefore that statute doesn't

5   grant authority, that doesn't end the Court's analysis,

6   which I think is what the plaintiffs want the Court to do,

7   is to end the analysis right there.

8           THE COURT:  I think that is correct.

9           MR. DUNPHY:  But the Court has to go beyond that

10  and say is there otherwise legal authority for the township

11  to pass this resolution.  I'm not aware of any regulation

12  or any requirement for the township to provide in its

13  resolution the basis for its resolution.  I think that's

14  sort of gratuitous, and, if the Court determines that case

15  applies to our situation, obviously it was erroneous in

16  terms of what specific statute they relied on.  I submit

17  it's of no consequence what the township said the basis of

18  their resolution was.  The issue is --

19          THE COURT:  But where does the authority come

20  from?

21          MR. DUNPHY:  The authority, Your Honor, comes

22  from a view from a number of different statutes.  It comes

23  from the obligation under two different statutes for the

24  township to maintain and control its roadways within the

25  township.  In fact, the township is made legally liable for

1   damages resulting from a failure to do so.  There are two

2   statutes that impose that obligation, 5535.01(C) as well as

3   5571.02.

4        And the Court -- that term "control" in 5571.02

5   is not defined.  So, therefore, the Court has to engage in

6   some kind of statutory construction, and there are a

7   number -- there are a number of statutes which grant

8   specific authority in various subject matters to a

9   township.  But the Court has to consider that we have these

10  two particular statutes that create this obligation to

11  maintain and control its roadways.

12        I submit that it's implied that, in order to

13  maintain and control, that the township has to have a means

14  by which to do that.  For example, in this case, if the

15  township is correct, the engineer's correct, that the use

16  of these weighted trucks is going to break up that

17  pavement, then that is going to create safety issues, and,

18  therefore, in order --

19        THE COURT:  Or maintenance issues, one or the

20  other.

21        MR. DUNPHY:  But also expenditure issues.  And if

22  the county -- if the township is going to carry out its

23  obligation, it has to have a means by which to do that,

24  otherwise -- otherwise, it's kind of futile for the

25  township.  And there have been circumstances that the 12th

District Court of Appeals which covers Warren County, there are two cases, I think, that are of significance, one which holds that a township has a duty to erect a stop sign, and, secondly, that if the township -- there is another case that the township that's referred to in my memorandum, that if the township doesn't carry out its duty to maintain and control its roads, then it's subject to an action in mandamus to do so.

So I submit, Your Honor, that -- that the case upon which the plaintiffs rely is limited in scope. It's limited in its holding. And the township may, if the Court determines it applies, may have mistakenly said that that was the basis of its authority. But that's not the question. The question is does it have authority. And I submit that, when you look at the various statutory provisions that relate to the obligations of a township particularly to maintain and control its roadways, that there must be implied in there an ability to take action to do so. And, in this case, the appropriate action, the one that bore a reasonable relationship to their concerns, was a decision to prohibit vehicles of that weight on these roadways.

And I thank you for your time, Your Honor.

THE COURT: Thank you, Mr. Dunphy.

Mr. Barger?

1    MR. BARGER:  Thank you.

2        From the outset, I would like to point out that

3    the resolution does state that it is according to section

4    45.07(I) of the revised code.

5        THE COURT:  And I think that Mr. Dunphy concedes

6    that's what it says.  But what he's saying is that they may

7    have said that incorrectly, but there is some inherent

8    power in these other statutes.  I think that's his

9    argument.

10       MR. BARGER:  And I understand what he's saying in

11   terms of implied powers.  Unfortunately, the case law

12   doesn't support that argument.  If there is one thing that

13   the Geauga County Commissioners case stands for, it's that

14   any grant of authority to a township must be an express

15   grant and that there are no implied grants, and there is no

16   case law that, certainly, that Mr. Dunphy has put forward

17   that supports this bootstrapping of authority based on one

18   part of a statute built on another.

19       We would submit that, if the Ohio General

20   Assembly desired townships to have this authority, they

21   would have done so in a clear and convincing manner,

22   particularly if they had every opportunity either in the

23   traffic section of the code or directly in the township

24   under Title V.

25       Furthermore, in support of our argument, I would

like to call the Court's attention to Ohio Attorney General

Opinion 78-021, which states that boards of township

trustees are without authority to retain the services of a

traffic consultant.

THE COURT: Is that a 1978 opinion?

MR. BARGER: Yes.

THE COURT: Has it been superseded in any way?

MR. BARGER: Not as of September 15, 2000.

And, again, the logic flows directly from the

fact that, if there is no authority to regulate traffic,

then they have no authority to engage traffic consultants.

And I think that issue is fairly conclusive. Furthermore,

in basing the resolution, this particular resolution, I

believe on -- Mr. Lawhorn testified their prosecutor told

them that they had the authority to do this under

4511.07(I) and directed them to no other section of the

code with respect to that authority.

So, for the reasons that we have stated and that

are contained in our brief, we would move this Court for

our preliminary injunction enjoining the township from

enforcing resolution 112000-01.

Thank you, Your Honor.

THE COURT: Thank you, Mr. Barger.

Counsel, let's take a brief recess and let me

figure out for a few minutes where we're going to go from

1   here.

2         We will stand in recess until the Court returns.

3         (A brief recess was taken.)

4                AFTER RECESS

5         THE COURT:  Counsel, I feel like Judge Wapner

6   here for an immediate decision after the commercial break.

7         The reason I wanted to announce the decision --

8   I'll have something written up either later today or

9   tomorrow -- but I want both sides to understand I

10   appreciate your concerns, and, in particular, I appreciate

11   the concern of the defendant.

12         And, Mr. Lawhorn, let me say this.  I'm very

13   impressed with you as a person and your dedication to the

14   township and all that you have done in your career for the

15   public.  And I appreciate why the township trustees did

16   this.

17         Unfortunately, the law, unfortunately for at

18   least the township trustees, the law of Ohio is very clear,

19   and I'm obligated to construe the law.  Just briefly,

20   section 4511.07(I) is not a grant of authority under both

21   the Geauga County cases that we have discussed and Board of

22   Township Trustees v. Funtime, Inc., which is also a Supreme

23   Court case.  Townships do not have home rule power and may

24   regulate only to express grants of authority, and I believe

25   that Union Township was without the authority to pass the

1 resolution about which the plaintiff complains. Because of

2 that, I have no choice other than to grant the preliminary

3 injunction of the plaintiffs.

4 The reason I'm announcing it now is what I would

5 like to do is figure out with you, and not necessarily

6 today, where we go from here. And I imagine you may want

7 to confer with your fellow trustees first and see what they

8 would like to do.

9 I think the law is clear. You know, this is only

10 a preliminary injunction hearing. You are entitled to an

11 ultimate hearing on the merits, but, since it is

12 essentially a question of law and not really a question of

13 any facts, although I want to say, Mr. Dunphy, I do

14 appreciate the defense you put on. I thought that was very

15 creative and the best you could make of a difficult

16 situation legally.

17 I doubt my opinion will change. I don't know

18 what further evidence anybody could produce that would

19 change my mind about what the law is, because, you know,

20 unfortunately it's one of those cases where it appears very

21 clear that's what it is. There is simply no authority for

22 the township to have done what it did.

23 Why don't I give you -- how much time would you

24 like? We could set a telephone conference call, say, in a

25 couple of weeks or a month to see if you want to proceed

 1  further and, if so, what you all want to do.

 2          Mr. Lawhorn, how long will it take you to confer

 3  with your fellow trustees?  Do you meet regularly?

 4          MR. LAWHORN:  Can I have one moment?

 5          THE COURT:  Sure.

 6          And, Mr. Barger, how long do you think you all

 7  will need, or Mr. Donnellon, or whatever?

 8          MR. DONNELLON:  We had discussed filing a motion

 9  for judgment on the pleadings now that an answer has come

10  in, so we don't think there is the need to schedule a

11  merits trial on this.

12          THE COURT:  I don't either.  That's why I'm just

13  going to see if we can shortcut all of this.

14          MR. DONNELLON:  If the township needs time to

15  confer, we will certainly allow that, with the intervening

16  holidays, perhaps longer than shorter.

17          THE COURT:  Right.  That's what I'm thinking.

18  You may not even need to file your motion.

19          MR. DUNPHY:  I'm sorry, Your Honor.  If we could

20  schedule something in the middle of January, that would be

21  fine.  I think that would give us sufficient time.

22          THE COURT:  Sure.

23          (Off the record.)

24          THE COURT:  Friday, January 25th at 2:30, does

25  that work for everybody?

1         MR. BARGER: That will work.

2         THE COURT: I just need counsel on the call, and

3 I assume -- let's see. Mr. Donnellon, Mr. Tepe, Mr.

4 Barger, Mr. Brady and Mr. Dunphy will be participating; is

5 that correct?

6         MR. DUNPHY: Yes, Your Honor.

7         THE COURT: If you're going to be anywhere other

8 than your offices, will you call my courtroom deputy, Steve

9 Snyder, whose direct dial is 513-564-7633, and let him know

10 what phone number we can reach you at for the conference

11 call?

12        And we will see where we go. I just don't want

13 anybody to go to any more work than they have to. You

14 know, it may be that the township trustees are going to

15 have to pursue this with the county commissioners.

16        Anything further on this matter?

17        I want to thank everybody for the preparation. I

18 appreciate your coming here, and I guess we are in recess.

19        COURT IN RECESS AT 4:25 P.M.

20

21                C E R T I F I C A T E

              I, Betty J. Schwab, the undersigned, do

22 hereby certify that the foregoing is a correct

   transcript from the record of the proceedings in

23 the above-entitled matter.

24              _Betty J. Schwab_____

              BETTY J. SCHWAB, RPR

25             Official Reporter